UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF NORTH CAROLINA
WINSTON-SALEM DIVISION

| | | |
|---|---|---|
| IN RE | ) | |
| | ) | Case No. 18-51081 |
| Gregory Bowman Hunter, Sr., | ) | |
| | ) | Chapter 7 |
| Debtor. | ) | |
| _____ | ) | |

### MEMORANDUM OPINION

This matter coming before the court on February 6, 2019 on the Debtor's
Motion to Convert this case from Chapter 7 to Chapter 11 (the "Motion"). At the
hearing, Thomas W. Waldrep, Jr. and John R. Van Swearingen appeared on behalf
of the Debtor, Ellis B. Drew, III appeared on behalf of Mountain Commerce Bank
("MCB"), Kiah T. Ford IV appeared on behalf of Todd O'Gara and Wanu Water, Inc.
("Wanu"), Robert E. Price, Jr. appeared on behalf of the Bankruptcy Administrator,
and C. Edwin Allman, III, the Chapter 7 trustee, also appeared. Having considered
the Motion and all other matters of record, including those incorporated through
judicial notice, the evidence presented at the hearing, and the arguments of counsel,
the court finds and concludes as follows:

### BACKGROUND

The Debtor filed a voluntary petition for relief under Chapter 7 of the
Bankruptcy Code on October 17, 2018 (the "Petition Date"), and C. Edwin Allman,
III was appointed to serve as Chapter 7 trustee (the "Trustee"). On the Petition
Date the Debtor, who holds an MBA from Wake Forest University, was earning

1

income as an independent contractor with a three-month contract with Musubu, a local technology company, in the amount of $12,500.00 per month. His original Schedule I showed household income of $15,500.00, and original schedule J showed expenses of $14,759.31, leaving net income in the amount of $740.69. The Schedule I indicated that the Debtor did not expect any increase or decrease in income within a year. Shortly after the Petition Date, the Debtor was offered a position as a director at Musubu where his duties now include marketing, sales, operations, and finance.[1] According to an Amended Schedule I filed January 4, 2019 the Debtor now has gross wages of $12,916.00 a month and household income of $15,916.00. He shows no amount on line 5a for taxes, Medicare, and Social Security deductions for himself. According to an amended Schedule J filed January 4, 2019 the Debtor had expenses of $14,759.31 and net income $1,156.69; his latest amended Schedule J filed the week before the hearing shows expenses of $13,214.31, including $4,000.00 a month for taxes, leaving monthly net income of $2,701.69.

The Debtor's schedules and statement show that prior to obtaining employment with Musubu, the Debtor had been in severe financial distress for a number of years. His Statement of Financial Affairs ("SOFA") lists gross income of $9,259.00 for 2018 as of the Petition Date, and $14,122.0 for 2016.[2]  The Debtor's

---

[1] Since the Debtor affirmatively indicated on his Schedule I that he expected his present income to continue, it appears that the Debtor had been offered long-term employment with Musubu prior to the Petition Date.

[2] The employment income as listed on the Debtor's SOFA does not match the Debtor's testimony at the February 6 hearing. The Debtor testified that he had a three-month employment contract at $12,500.00/month starting in August 2018. He also testified that he taught a 30-day course in 2017 at the Wake Forest University business school. The Debtor lists only $9,259.00 for year-to-date employment

SOFA shows that in 2018 he took an early IRA withdrawal and a deferred compensation early payout to have a total of over $330,000.00 in other income. In 2017, the Debtor's SOFA shows that he liquidated over $300,000.00 in assets, and in 2016 the Debtor liquidated over $370,000.00 in assets. The Debtor and his spouse own a home with a petition value of $695,500.00 encumbered by a first mortgage with a balance of approximately $550,000.00 and a second mortgage in favor of his parents. He listed the amount of his parents' claim as $90,000.00, but admitted at the February 6 hearing that the claim was closer to $39,000.00. He has a half interest in a 2008 Lexus with 290,000 miles on it and a value of $4,280.00. The Lexus is encumbered by a lien in the amount of $19,235.00. He lists priority debts totaling $45,636.86 and general unsecured claims in the amount of $738,546.59 in an amended Schedule E/F. The Debtor lists interests in Hunter Family LLC and Kingsley Investment Group, LLC in Schedule A/B with values of $0.00.[3]

Also on his Schedule A/B, the Debtor lists a civil action pending in the United States District Court for the Middle District of North Carolina, Case No. 15-CV-1050 styled *Gregory Hunter and Hunter Family Capital, LLC v. Mountain Commerce Bank and Bobby A. Brown* (the "Civil Case") which the Debtor valued at $3,000,000.00.[4] In the Civil Case, the Debtor asserts that MCB's employee made a

---

income in 2018 as of the October Petition Date. The Debtor lists no employment income for 2017.

[3] Hunter Family LLC should have been listed as Hunter Family Capital, LLC.

[4] At the February 6 hearing the Debtor clarified that he valued his individual claim against MCB and the Hunter Family Capital claim against MCB together for a total of $3,000,000.00. The Debtor did not list the federal court case but a state court case in Forsyth Superior Court, Case No. 15 CVS 6949 with a value of $3,000,000.00 in his Schedule A/B.

number of false or misleading statements in connection with an SBA loan application for Kingsley Investments,[5] an entity originally owned 50% by Bob Feathers and 50% by Hunter Family Capital. The Debtor presently owns a 35% interest in Hunter Family Capital.[6] As generally described at the February 6 hearing, the SBA loan application with MCB was part of a business plan by Kingsley Investments to obtain multistore financing for a number of East Coast Wings franchises in Tennessee. The Debtor asserts that he, individually, suffered damages as a result of MCB's false or misleading statements indicating that the SBA loan was being processed when in fact, it was not. Among other contentions, the Debtor alleges that he sold his book of business from his previous employment as an Oppenheimer financial advisor under financial duress. The Civil Case is currently set for trial in April 2019, and a motion for summary judgment is pending. According to the Debtor's schedules, he has essentially no other nonexempt assets of value other than his potential damages in the Civil Case.

On December 13, 2018, the Trustee filed a Motion for Approval of Settlement of Disputed Claim against MCB and Bobby A. Brown (Docket No. 21) seeking approval of a proposed settlement of the Debtor's claims in the Civil Case for the sum of $150,000.00 along with subordination of MCB's claim in the bankruptcy

---

[5] This is the same entity listed in Debtor's Schedule A/B as Kingsley Investment Group, LLC.

[6] The Debtor originally owned a 50% interest in Hunter Family Capital, but transferred 30% of his interest (15% of Hunter Family Capital) to his children within two years prior to the Petition Date. In addition, it was stipulated at the February 6 hearing that due to missed capital calls in Kingsley Investments, the Hunter Family Capital percentage ownership in Kingsley has decreased, but the amount of such decrease is uncertain.

case. This settlement would not affect the Hunter Family Capital claim against MCB. In response, the Debtor has filed the Motion seeking to convert to Chapter 11. His stated intent is twofold: (1) he wishes to incorporate his postpetition income into his bankruptcy estate[7] and (2) he wishes to continue prosecution of the Civil Case because he does not agree with the Trustee's proposed settlement. Todd O'Gara and Wanu[8] as well as MCB[9] filed objections asking that the court deny the Motion for cause. In addition, the Trustee filed a response describing the Civil Case as an ill-conceived and fanciful lawsuit and requesting the court enter such order as it deems appropriate (Todd O'Gara, Wanu, MCB, and the Trustee are collectively referred to herein as the "Respondents").

## DISCUSSION

Section 706 of the Bankruptcy Code provides in relevant part

> (a) The debtor may convert a case under this chapter to a case under chapter 11, 12, or 13 of this title at any time, if the case has not been converted under section 1112, 1208, or 1307 of this title. Any waiver of the right to convert a case under this subsection is unenforceable.

---

[7] Although the Debtor claims he wants to convert to include his postpetition income into his bankruptcy estate, he did not file his Amended Schedules I and J until January 4, 2019, showing $1,156.69 in net monthly household income, along with the Motion, two months after he started his full-time job with Musubu and three weeks after the Trustee filed the Motion for Approval of Settlement.

[8] Todd O'Gara and Wanu Water, Inc. are listed on Debtor's Schedule E/F with the amount of the claim listed as unknown and are plaintiffs in a lawsuit against the Debtor, *O'Gara et al. v. Hunter,* 18-CV-00825, pending in the United States District Court for the Middle District of North Carolina, asserting claims for tortious interference with business relations, tortious interference with contract, negligent misrepresentation, violation of unfair competition laws, libel, and civil conspiracy. They have also filed an adversary proceeding, *O'Gara et al. v. Hunter,* Ad. Proc. No. 18-6036, requesting a determination that their claims are nondischargeable.

[9] MCB is listed on Debtor's Schedule E/F with a disputed claim in the amount of $500,000.00 based on a promissory note.

. . . .

> (d) Notwithstanding any other provision of this section, a case may not be converted to a case under another chapter of this title unless the debtor may be a debtor under such chapter.

Though § 707(a) gives a debtor broad authority to convert, the Supreme Court has interpreted § 707(d) to limit a debtor's right to convert a Chapter 7 case to a case under Chapter 13. *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365 (2007). In *Marrama,* the Court found that there were "at least two possible reasons" why a debtor may not qualify to convert from Chapter 7 to Chapter 13, the requirements of § 109(e) and for "cause" under § 1307(c). *Id.* at 372. The Court found the debtor's bad faith conduct constituted cause under § 1307(c) such that the debtor did not qualify to be a debtor under Chapter 13. *Id.* at 374. The Court also found that § 105(a) authorizes "an immediate denial of a motion to convert filed under § 706 in lieu of a conversion order that merely postpones the allowance of equivalent relief and may provide the debtor with an opportunity to take action prejudicial to creditors." *Id.* at 375. Later, in *Law v. Siegel*, the Supreme Court further explained *Marrama*, "even if the Bankruptcy Court's refusal to convert the case had not been expressly authorized by § 706(d), that action could have been justified as a way of providing a 'prompt, rather than a delayed, ruling on [the debtor's] unmeritorious attempt to qualify' under § 1307(c)." *Law v. Siegel*, 571 U.S. 415, 426 (2014) (quoting *Marrama* at 376).

Though *Marrama* addresses a Chapter 7 debtor's conversion to Chapter 13, courts have found its analysis applicable where a Chapter 7 debtor seeks to convert to Chapter 11, reasoning that § 1112(b) serves the same purpose as § 1307(c). *In re*

*Woodruff,* 580 B.R. 291, 296 (Bankr. M.D. Ga. 2018); *In re FMO Assoc. II,* LLC, 402

B.R. 546, 551 (Bankr. E.D.N.Y. 2009); *In re Broad Creek Edgewater, LP*, 371 B.R.

752, 758 (Bankr. D. S.C. 2007). As such, a Chapter 7 debtor seeking to convert to

Chapter 11 must be eligible to be a debtor under that chapter and not subject to

conversion or dismissal for cause as set forth in § 1112(b), including but not limited

to bad faith. *In re Daughtrey,* 896 F.3d 1255 (11th Cir. 2018) (affirming bankruptcy

court's denial of Chapter 7 debtor's motion to convert to Chapter 11 on the grounds

that statutory cause existed under § 1112(b)(4)(E), (H), and (M)); *In re Miller*, 496

B.R. 469 (Bankr. E.D. Tenn. 2013) (granting Chapter 7 debtor's motion to convert to

Chapter 11 after finding cause had not been shown under § 1112(b)(4)(A)); *In re

Broad Creek Edgewater, LP*, 371 B.R. at 759 (denying Chapter 7 debtor's motion to

convert to Chapter 11 for cause under § 1112(b)(4)(B)). Courts are in agreement

that the burden rests with the objecting party to demonstrate by a preponderance of

the evidence why the debtor should not be permitted to convert to a case under

Chapter 11. *In re Mercury Data Systems, Inc.*, 586 B.R. 260, 270 (Bankr. E.D. Ky.

2018); *In re Broad Creek Edgewater, LP*, 371 B.R. at 757; s*ee also In re Goines,* 397

B.R. 26, 33 (Bankr. M.D.N.C. 2007).

   Here, the Respondents point to a substantial or continuing loss to the estate

along with the absence of a reasonable likelihood of rehabilitation, 11 U.S.C.

§ 1112(b)(4)(A), as well as various misrepresentations and omissions made by the

Debtor, the Debtor's postpetition interference with the Civil Case, and the Debtor's

improper motivation in obstructing the Trustee's proposed settlement as grounds to deny the Motion.

Section 1112(b)(4)(A)

Section 1112(b)(4)(A) provides that cause exists to dismiss or convert a case if the movant establishes both (1) substantial or continuing loss to or diminution of the estate post-petition, and (2) the absence of a reasonable likelihood of rehabilitation. Under the first prong, substantial or continuing loss to or diminution of the estate, the "loss or decline in value must be either *substantial* or *continuing,* but need not be both." *In re Paterno,* 511 B.R. 62, 66 (Bankr. M.D.N.C. 2014) (citing *In re Creekside Sr. Apartments, L.P.,* 489 B.R. 51, 61 (6th Cir. BAP 2013) and *In re Landmark Atlantic Hess Farm, LLC,* 448 B.R. 707, 714 (Bankr. D. Md. 2011)). As to the second prong, this court has previously described "absence of a reasonable likelihood of rehabilitation" as follows,

> Rehabilitation is a more demanding standard than reorganization, and is defined by whether the debtor will be able to reestablish his business on a firm, sound basis . . . Where a debtor proposes a plan of pure liquidation, there is no likelihood of rehabilitation. Thus, rehabilitation depends upon establishing a cash flow from which current obligations can be satisfied. This prospect must be premised on objective facts, not merely speculative data, and is determined by the Court based on evidence presented at the hearing.

*In re Paterno*, 511 B.R. at 68–69 (quotation and citations omitted).

Two cases in which courts have allowed a Chapter 7 debtor to convert to a Chapter 11 case and have analyzed the conversion request pursuant to § 1112(b)(4)(A) are instructive.  In *In re Basil Street Partners, LLC*, the court found

that the second prong of § 1112(b)(4)(A) could not be proven by an objecting creditor when an entity related to the involuntary Chapter 7 corporate debtor proposed a $5 million equity infusion to the debtor's business. *In re Basil St. Partners, LLC*, 477 B.R. 856, 862 (Bankr. M.D. Fla. 2012). In *In re Miller*, the individual involuntary Chapter 7 debtor was a real estate broker who jointly owned a real estate company with his wife. *In re Miller*, 496 B.R. 469, 482 (Bankr. E.D. Tenn. 2013). When the debtor sought to convert to Chapter 11, an objecting creditor argued that there was cause to deny the motion under § 1112(b)(4)(A). *Id.* at 479. The evidence at the hearing showed that the debtor's various assets generated some income, and that he would propose a plan whereby he would sell some assets and continue some of his businesses in order to pay his debts. *Id* at 480. In addition, his wife was a debtor in a Chapter 11 case and their properties and estates were closely related and intertwined. *Id*. at 482. The court found that the objecting creditor did not demonstrate either prong of § 1112(b)(4)(A) and joint creditors of the debtor and his wife would be better served if both debtors were in Chapter 11. *Id*.

Cases in which courts have found cause under § 1112(b)(4)(A) to deny a motion to convert a Chapter 7 case to Chapter 11 are similarly instructive. In *In re Woodruff*, a voluntary Chapter 7 debtor requested conversion to a Chapter 11 after inheritance of stock valued at $120,000.00. *In re Woodruff*, 580 B.R. 291 (Bankr. M.D. Ga. 2018). Finding cause under § 1112(b)(4)(A), the court concluded that allowing the debtor to propose a liquidating Chapter 11 plan would subject the estate to continuing diminution without a reasonable likelihood of rehabilitating the

debtor's finances. The court pointed to the debtor's inconsistent future income prospects and concluded that reducing ongoing household expenses during the Chapter 11 case was "unlikely to offset the large administrative costs of a Chapter 11 filing." *Id.* at 300. The court noted the debtor's motive for conversion, taking control of the estate from the trustee, and reasoned that a Chapter 11 "would accomplish nothing more than a liquidation of the estate's assets but would impose additional costs and delay on creditors." *Id.*

Similarly in *Braunstein v. Waller*, the district court affirmed the bankruptcy court's denial of a voluntary Chapter 7 debtor's motion to convert to Chapter 11 that was filed after the Chapter 7 trustee filed a motion to approve bid procedures of certain property. *Braunstein v. Waller*, No. 11 C 7991, 2012 WL 1802145, at *1 (N.D. Ill. May 16, 2012). The court found that the record did not show that there was any business to reorganize, and that conversion would be an exercise in futility and risk the dissipation of assets of the estate. *Id.* at *2.  Instead, the court noted that the bankruptcy court could legitimately conclude that a conversion would be a "waste of time and resources since the bankruptcy would inevitably be converted back into a Chapter 7 bankruptcy." *Id.*

In *In re Gordon*, the 80-year old Chapter 7 debtor had drafted a four-year plan which provided for her to sell her assets, and that upon such sale, her creditors would be paid in full. *In re Gordon*, No. 312-09605, 2015 WL 5553506 at *1 (Bankr. M.D. Tenn. Sept. 18, 2015). However, the Chapter 7 trustee had liquidated the majority of the debtor's assets and the one remaining non-exempt asset did not have

a current appraisal; the debtor would have had to draw from the already liquidated estate property in Chapter 7 in order to meet her ongoing expenses and the mortgage payment on that one asset. *Id*. The court referred to her proposal as a "plan of slow liquidation rather than a plan of reorganization" and found that the continued diminution of the estate and lack of a reasonable likelihood of rehabilitation constituted cause under § 1112(b)(4)(A) to deny the motion to convert. *Id*. at *2.

In the present case, the Debtor offered extensive testimony in conjunction with a "liquidation analysis" that he had prepared comparing his Chapter 7 with a hypothetical Chapter 11. The Debtor calculates that unsecured creditors would recover 18 cents on the dollar in a Chapter 7, but no less than 51 cents on the dollar through a Chapter 11 plan.[10] The Respondents and Bankruptcy Administrator effectively discredited the Debtor's analysis as deeply flawed. In his analysis, the Debtor shows his Chapter 11 case as generating $194,521.68 in postpetition income ($2,701.69 for six years) and his claim against MCB, along with Hunter Family Capital's claim, yielding $0, $300,000.00 or $3,000,000.00 (netting $180,000.00 to $1,800,000.00 after a 40% contingency fee to his attorneys). However, this analysis does not reflect any unsecured claim of MCB or any provision for a claim by Wanu asserted against him in *O'Gara et al. v. Hunter,* 18-CV-00825. In addition, the Debtor includes no amount for Chapter 11 costs of administration in his proposed

---

[10] Neither the Debtor's Chapter 7 liquidation analysis nor his Chapter 11 liquidation analysis comply with the priority scheme set forth in the Bankruptcy Code.

budget or for litigation expenses other than his attorneys' contingency fee,[11] and the Debtor admitted that he has not yet adopted the budget on his latest Amended Schedule J.[12]  The Amended Schedule J that he filed in January showed net income of only $1,156.69.

The Debtor also presented an overview of the basis for the claims he asserts in his Civil Case, as well as expert witness reports and various exhibits that could be used to support his claims. As for damages, the Debtor asserts that he and Hunter Family Capital could be awarded as much as $3,000,000.00. In response, the Respondents pointed out significant weaknesses in the Debtor's claims in the Civil Case. MCB estimates that even in the event the Debtor is successful, the damage award would be less than $100,000.00. The Debtor admitted that while he included damages for Hunter Family Capital in his analysis, he was not familiar with Hunter Family Capital's basis for damages as he had not "looked at it in a while."

While the parties agree on little, the court finds that the following basic facts were established at the hearing,

- The Debtor established that he currently has monthly gross income of $12,916.00. His latest Amended Schedule J shows a proposed budget should

---

[11] The Debtor's prosecution of his Civil Case relies in part on expert witness reports and testimony. The Debtor's experts are listed as a prepetition creditors on his schedules. The Debtor contends that these experts are willing to waive their substantial prepetition fees. But there is no indication that these experts would also waive their fees for providing expert testimony at the trial.

[12] The Debtor argues that he can increase his net income as shown on his proposed Amended Schedule J by "tightening his belt." It is clear from the Debtor's statements and schedules that he has been in severe financial distress for a number of years. The court finds it difficult to fathom that the Debtor has not already tightened his belt to the extent he is willing and able to do so.

his case be converted to Chapter 11. Because he has not yet adopted this budget, the net income as reflected on his latest Amended Schedule J is speculative.

- Debtor's counsel in the Civil Case, Kevin Cartledge and Spilman Thomas & Battle, have agreed to waive their prepetition claims in the amount of $187,429.92 against the Debtor if they are allowed to represent him going forward for a 40% contingency fee.

- MCB asserts a claim against the Debtor based on a promissory note in the amount of approximately $490,000.00. The Debtor listed this claim (in the amount of $500,000.00) as disputed on his schedules.

- Whether the Debtor will be successful in the Civil Case, and whether any damages will be awarded if the Debtor is successful, is speculative.

- If the Debtor converts to Chapter 11, the Debtor will incur administrative expenses. Neither the Debtor's latest Amended Schedule J nor his Chapter 11 liquidation analysis include an amount for Chapter 11 administrative expenses.

The Debtor asks to convert to Chapter 11 so that he can regain control of the Civil Case and withdraw from the settlement agreement. Conversion will, in effect, result in the immediate loss of $150,000.00 from the estate as well as the loss of MCB's agreement that it will not participate in the dividend available to creditors from these funds. The court finds that the loss of the Trustee's settlement agreement is a substantial post-petition loss to the estate, and that the first prong has been met.

Turning to the second prong, absence of a reasonable likelihood of rehabilitation, it is this issue that goes to the heart of the Debtor's motion to convert. With the Trustee's settlement agreement, the estate will have $150,000.00 in funds available for prompt distribution, and MCB's $490,000.00 claim will be taken out of the equation. The Debtor seeks to replace that certainty with the hope

of a bigger payout. Much like the debtors in *Woodruff, Braunstein*, and *Gordon*, the Debtor is not seeking Chapter 11 for the purpose of rehabilitation, but rather he is seeking to convert to gain control of an asset of the estate and liquidate that asset in a riskier way.

      As set forth above, neither the Debtor's net income nor the value that he places on the Civil Case are based on objective data; these figures are based on speculation and therefore do not support a finding of a reasonable likelihood of rehabilitation. Looking at his net income, not only is the figure speculative, it is clear that the Debtor has not given proper consideration to the costs of a Chapter 11, such as quarterly fees, attorney's fees, and litigation costs. As the Trustee bluntly points out, if the litigation is resolved unfavorably, there is no way the Chapter 11 can continue—fees will outpace any small net monthly income the Debtor might have. The court must agree.

      Similarly, even according to the Debtor's own analysis, the amount of his claim against MCB is speculative. This court will not delve into the relative merits of the Civil Case other than to conclude that continuation of the litigation subjects the Debtor's creditors to substantial risk. The Debtor asserts that even in a "worst-case scenario" in which the claim against MCB resolves with no benefit to the estate, a Chapter 11 would still yield a slightly higher return to unsecured creditors than the Chapter 7. Unfortunately, as pointed out by the Respondents, the Debtor fails to include amounts for either MCB's $490,000.00 claim or a claim on behalf of Wanu. As an independent party with a fiduciary duty to liquidate the property of

14

the estate in a manner that is in best interest of the parties in interest, the Trustee

is in a better position to objectively weigh the risks and benefits than the Debtor,

who has been embroiled in the litigation for years.

In summary, the immediate loss that the estate would suffer from

withdrawal of the settlement agreement is a loss from which it appears unlikely

that the estate could ever recover. To the extent that the Debtor purports to be

seeking rehabilitation, the court cannot find that it is reasonably likely he would

succeed in that endeavor. The Debtor's contention that he desires to contribute his

net monthly income to his creditors through a Chapter 11 plan is discounted by the

court due to the relatively insignificant increase in income since the Petition Date,

$416.00, and his admission that he has not yet attempted to adhere to his proposed

budget. The Debtor's core motive for conversion is not rehabilitation, but to regain

control of the Civil Case so he can continue to litigate. Given the substantial loss

the estate would suffer upon conversion and repudiation of the settlement

agreement and the absence of a reasonable likelihood of rehabilitation the court

finds cause under § 1112(b)(4)(A).

The Absence of Good Faith

The Fourth Circuit has held that filing in good faith is an implicit

requirement in seeking relief under the Bankruptcy Code, and that the absence of

good faith can constitute cause for dismissal. *Carolin Corp. v. Miller*, 886 F.2d 693,

698 (4th Cir. 1989). When faced with allegations of bad faith in the Fourth Circuit,

courts must examine the totality of the circumstances and consider both the

objective futility of reorganization as well as the subjective bad faith of seeking relief under the Bankruptcy Code. *Id.* at 701. Courts inquire into the objective futility of a Chapter 11 case to determine whether "there is no going concern to preserve . . . and . . . no hope of rehabilitation, except according to the debtor's 'terminal euphoria.'" *Id.* at 701–02 (quoting *Little Creek Dev. Co. v. Commonwealth Mortgage Corp. (In re Little Creek Dev. Co.)*, 779 F.2d 1068, 1073 (5th Cir. 1986)). The subjective bad faith inquiry is intended to determine whether the debtor is motivated by some improper purpose. *Id.* at 703.

Here, the court has already found the absence of a reasonable likelihood of rehabilitation and finds that its analysis on that issue goes to objective futility. *In re Rain Tree Healthcare of Winston-Salem, LLC*, 585 B.R. 777, 786 (M.D.N.C. 2018). ("The objective futility of [debtor's] case is evidenced by those same facts indicating that there is not a likelihood of reorganization.").

Turning to the subjective inquiry, in considering the totality of the circumstances, courts look for various indicia and patterns that might suggest bad faith though "there is no single factor that will necessarily lead to a finding of bad faith." *Carolin*, 886 F.2d at 701 (internal quotations omitted). Here, Wanu alleges that the Debtor made a number of misrepresentations and omissions on his schedules and statements. Wanu contends that the Debtor undervalued his Wanu shares by listing them on Schedule A/B as worthless. At his § 341 meeting, the Debtor conceded that they could be worth more, in the range of zero to 25 cents each. Wanu contends that on the Petition Date, one share of its stock had a value

16

between 70 cents and $1.10. Wanu has not offered any evidence in support of its claim and the court finds that the Debtor has adequately explained the basis for his valuation. In addition, Wanu asserts that the Debtor has been unwilling to accurately value his wine collection and his firearms. The Debtor counters that he has provided the Trustee with all information requested about his assets, and he also explains that his wine collection was damaged when the climate control system for his wine storage broke down last summer.

The Debtor admits that he did not disclose on his SOFA a gratuitous transfer of 30% of his membership interest in Hunter Family Capital to his three children within two years of the Petition Date. At the hearing, he explained that he did not know the transfer had been within two years. This explanation is not sufficient. In exchange for a fresh start, the Bankruptcy Code requires debtors to provide accurate, honest, and complete information on their schedules and statements. The Debtor's apparent failure to review his financial records not does excuse him from this requirement. Also, the Debtor did not disclose a conveyance made on May 14, 2018 to his parents in the form of a second deed of trust on his home to secure a debt he owed to them dating from 2017, and he overstated the amount of the debt, listing it as $90,000.00 instead of $39,000.00.  While the Debtor explained that he did not understand that the deed of trust was a transfer, this explanation carries little weight in light of the Debtor's education and professional experience, as well as the fact that the Debtor was represented by sophisticated bankruptcy counsel who assisted him with the preparation and filing of his schedules and SOFA. The

17

Trustee indicates that the Debtor has now provided him with corrected information and has diligently responded to any of his requests for information. While not all of the points brought out by the Respondents are given credence in the absence of specific evidence, it remains of concern to the court that the Debtor's amended schedules and his SOFA have not corrected these particular misstatements and omissions, and that some of these inaccuracies revolve around transfers to insiders, his children and his parents.

Of further concern is the Debtor's attempt to exercise control over and interfere with property of the estate. Upon the filing of the bankruptcy petition, the Debtor's interest in the Civil Case vested in the bankruptcy estate to be administered by the Trustee. 11 U.S.C. §§ 541 and 704. Accordingly, the Trustee entered into a settlement agreement with MCB, filed a motion to approve settlement in this bankruptcy case, and filed a notice of agreement in principle in the Civil Case. Subsequently, the Debtor through counsel Kevin Cartledge filed a pleading in response to the notice of agreement in principle in the Civil Case (Docket No. 66) requesting that the District Court issue a memorandum opinion on summary judgment.[13] The Trustee asserts that in doing so, the Debtor violated the automatic stay and, had the District Court ruled unfavorably, risked destroying the value of the Civil Case. Judge Osteen entered a text order identifying that same concern, which reads in part:

> [T]his court does not intend to issue an order on the summary
> judgment motion until some time following the February 6, 2019

---

[13] At the Debtor's request, this court has taken judicial notice of the matters of record in the Civil Case.

[bankruptcy court] hearing. While counsel for Plaintiffs may be correct that a favorable opinion and order on summary judgment 'could dramatically affect the outcome of the motion to approve any agreement to settle in the bankruptcy matter,' (Doc. 66 at 2), an unfavorable ruling could correspondingly undermine any agreement between the Trustee and Defendants.

In his response in support of his Motion (Docket No. 67), the Debtor counters that he did not file the pleading in the Civil Case individually, that it was filed on behalf of Hunter Family Capital. Moreover, the Debtor asserts that the pleading was informational only. At the hearing, Mr. Cartledge testified that he acted under the direction of Mr. Waldrep. As to these explanations, the court can only note that the pleading in question, Docket No. 66 filed in the Civil Case, clearly begins "NOW COME Plaintiffs Gregory Hunter and Hunter Family Capital, LLC (collectively, the 'Plaintiffs')…." and it concludes with a "request" that the court enter a memorandum opinion on summary judgment without delay.

And so, the Debtor argues that he has provided explanations for any issues with his schedules and statements, as well as his attempt to usurp control of estate property from the Trustee, and that the record does not reflect the type of bad faith conduct that has previously disqualified Chapter 7 debtors from converting their cases in this district. In *In re Southern*, the bankruptcy court denied a Chapter 7 debtor's motion to convert to Chapter 13 after finding that the debtor had failed to disclose assets and transfers on his schedules and statements, was untruthful at his § 341 meeting, and intentionally hid an asset in an effort to defraud creditors. *In re Southern*, No. 10-50713, 2011 WL 1226058, at *3 (Bankr. M.D.N.C. March 29, 2011). In *Goines*, the Chapter 7 debtor sought to convert to Chapter 13 after default

19

judgments had been entered in both a § 727 discharge proceeding and a fraudulent conveyance action. *In re Goines*, 367 B.R. at 29. The court found an undisclosed transfer of real property to insiders, misrepresentations on schedules and statements, and misrepresentations at the § 341 meeting were evidence of bad faith. *Id*. at 34. Indeed, the present case can be distinguished from *Goines* and *Southern* by the Trustee's acknowledgement that the Debtor has timely and adequately responded to the Trustee's requests for information relating to the Debtor's financial affairs, even though the SOFA has not been amended.

Finally, there is a question as to whether the Debtor's primary motive for conversion—to stop the settlement agreement—is in and of itself indicative of bad faith. *See In re Ordonez*, No. BR 10-37596, 2017 WL 4877242, at *7 (Bankr. D. Utah Oct. 27, 2017) (finding motivation to convert case to retain control of a lawsuit at the expense of creditors evidence of bad faith); *In re Gedda*, No. 6-13-bk-02238-KSJ, 2015 WL 1396605 at *4 (Bankr. M.D. Fla. Mar. 24, 2015) (determining that the debtor's "desperate attempt" to "wrangle control" of fraudulent transfer litigation from Chapter 7 trustee by converting to Chapter 11 was evidence of bad faith). At this time, the $150,000.00 settlement will not result in funds being returned to the Debtor over and above the claims in the case, thus the Debtor is not risking his own funds when he requests conversion to Chapter 11 and the resulting elimination of the $150,000.00 settlement agreement. In the event that the Civil Case is resolved unfavorably to the Debtor, he will be in the same position that he is now; it is only

his creditors who will be worse off. Thus, in asking to convert, the Debtor is in effect asking to shift the risk of unsuccessful litigation to his creditors.[14]

Courts have found that using Chapter 11 to speculate that a single asset will provide a "one-shot profit" at the creditor's risk is an impermissible purpose and indicates bad faith. *Carolin*, 886 F.2d at 704-05; *In re Fairfield TIC, LLC*, 594 B.R. 852, 861 (Bankr. E.D. Va. 2018). A debtor's conversion to Chapter 11 must protect the interests of creditors and the estate, not just its own interest. *In re 10 Bears at Chiloquin, Inc.*, No. 06-62079-FRA7, 2007 WL 1673538, at *5 (Bankr. D. Or. June 6, 2007) (denying Chapter 7 debtor's motion to convert to Chapter 11 after finding bad faith and gross mismanagement). The Debtor's postpetition filing in the Civil Case requesting an action that could have undermined the Trustee, who is working to liquidate the property of the estate in a manner that is consistent with the best interests of the creditors, reflects that the Debtor is acting with his own interests, first and foremost, in mind.

The Debtor's bankruptcy process began with his decision to file his Chapter 7 petition and statements and schedules disclosing his assets, liabilities, and financial transactions. He filed his voluntary Chapter 7 petition listing one significant non-exempt asset of value, his claim against MCB, to be administered by the Chapter 7 Trustee. When the Trustee negotiated a settlement agreement to liquidate this primary asset of the estate, the Debtor filed the Motion and interfered in the Civil

---

[14] The Debtor's litigation counsel for the Civil Case supports the Motion, but in the event of success, would have the advantage of having a Chapter 11 administrative claim due to the contingency fee arrangement rather than a prepetition, general unsecured claim.

Case, risking the value of the asset to the detriment of his creditors. The Debtor's business decision several years ago to develop East Coast Wings franchises in Tennessee shows that he took a risk to leave his employment at Oppenheimer to embark on that venture. As a result of taking that risk he has incurred substantial unsecured debts. Now, the Debtor is asking that the court allow him to take another risk—that of converting his case, repudiating the Trustee's proposed settlement with MCB, and going forward with his lawsuit against MCB. A conversion to Chapter 11 by the Debtor would risk the only significant listed non-exempt asset of the estate. The Debtor's request to convert in this particular context constitutes an abuse of the bankruptcy process. In light of the Debtor's improbable and speculative vision of a successful Chapter 11 plan and his improper purpose for seeking Chapter 11, the court finds cause exists due to the absence of good faith.

## CONCLUSION

Based upon the foregoing, the court finds that Respondents have shown by a preponderance of the evidence that cause exists under § 1112(b). A separate order denying the Motion will be entered.


February 19, 2019

_____
Lena Mansori James
United States Bankruptcy Judge